# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP157-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |        Plaintiff-Respondent, |
| |    v. |
| | Eric L. Loomis, |
| |        Defendant-Appellant. |

ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 13, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 5, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | La Crosse |
|   JUDGE: | Scott L. Horne |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | ROGGENSACK, C. J. concurs (Opinion filed). |
| | ABRAHAMSON, J. concurs (Opinion filed). |
|   DISSENTED: | |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant, there were briefs by *Michael D. Rosenberg* and *Community Justice, Inc.*, Madison, and oral argument by *Michael D. Rosenberg*.

For the plaintiff-respondent, the cause was argued by *Christine A. Remington*, assistant attorney general, with whom on the brief was *Brad D. Schimel*, attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2015AP157-CR
(L.C. No. 2012CF75 & 2013CF98)

STATE OF WISCONSIN       :       IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

      **v.**

**Eric L. Loomis,**

      **Defendant-Appellant.**

**FILED**

**JUL 13, 2016**

Diane M. Fremgen
Clerk of Supreme Court

---

APPEAL from an order of the circuit court. *Affirmed.*

¶1 ANN WALSH BRADLEY, J. In 2007, the Conference of Chief Justices adopted a resolution entitled "In Support of Sentencing Practices that Promote Public Safety and Reduce Recidivism."[1] It emphasized that the judiciary "has a vital role to play in ensuring that criminal justice systems work

---

[1] Conference of Chief Justices, Conference of State Court Administrators, National Center for State Courts, Resolution 12: In Support of Sentencing Practices that Promote Public Safety and Reduce Recidivism (August 1, 2007), http://ncsc.contentdm.oclc.org/cdm/ref/collection/ctcomm/id/139.

effectively and efficiently to protect the public by reducing recidivism and holding offenders accountable."[2]   The conference committed to "support state efforts to adopt sentencing and corrections policies and programs based on the best research evidence of practices shown to be effective in reducing recidivism."[3]

¶2   Likewise, the American Bar Association has urged states to adopt risk assessment tools in an effort to reduce recidivism and increase public safety.[4]   It emphasized concerns relating to the incarceration of low-risk individuals, cautioning that the placement of low-risk offenders with medium and high-risk offenders may increase rather than decrease the risk of recidivism.[5]   Such exposure can lead to negative influences from higher risk offenders and actually be detrimental to the individual's efforts at rehabilitation.[6]

¶3   Initially risk assessment tools were used only by probation and parole departments to help determine the best

---

[2] Id.

[3] Id.

[4] American Bar Association, Criminal Justice Section, State Policy Implementation Project, 18, http://www.americanbar.org/content/dam/aba/administrative/criminal_justice/spip_handouts.authcheckdam.pdf.

[5] Id. at 19.

[6] Id.

supervision and treatment strategies for offenders.[7]  With nationwide focus on the need to reduce recidivism and the importance of evidence-based practices, the use of such tools has now expanded to sentencing.[8]  Yet, the use of these tools at sentencing is more complex because the sentencing decision has multiple purposes, only some of which are related to recidivism reduction.[9]

¶4   When analyzing the use of evidence-based risk assessment tools at sentencing, it is important to consider that tools such as COMPAS continue to change and evolve.[10]  The concerns we address today may very well be alleviated in the future.  It is incumbent upon the criminal justice system to recognize that in the coming months and years, additional research data will become available.  Different and better tools

---

[7] Pamela M. Casey et al., National Center for State Courts (NCSC), Using Offender Risk and Needs Assessment Information at Sentencing:  Guidance for Courts from a National Working Group, at 1 (2011), http://www.ncsc.org/~/media/Microsites/Files/CSI/RNA%20Guide%20Final.ashx.

[8] See, e.g., National Center for State Courts (NCSC), Conference of Chief Justices and Conference of State Court Administrators, Resolution 7:  In Support of the Guiding Principles on Using Risk and Needs Assessment Information in the Sentencing Process (2011), http://www.ncsc.org/~/media/Microsites/Files/CSI/Resolution-7.ashx.

[9] Casey, Using Offender Risk and Needs Assessment Information at Sentencing, supra note 7, at 1.

[10] "COMPAS" stands for "Correctional Offender Management Profiling for Alternative Sanctions."

may be developed. As data changes, our use of evidence-based tools will have to change as well. The justice system must keep up with the research and continuously assess the use of these tools.

¶5 Use of a particular evidence-based risk assessment tool at sentencing is the heart of the issue we address today. This case is before the court on certification from the court of appeals.[11] Petitioner, Eric L. Loomis, appeals the circuit court's denial of his post-conviction motion requesting a resentencing hearing.

¶6 The court of appeals certified the specific question of whether the use of a COMPAS risk assessment at sentencing "violates a defendant's right to due process, either because the proprietary nature of COMPAS prevents defendants from challenging the COMPAS assessment's scientific validity, or because COMPAS assessments take gender into account."[12]

¶7 Loomis asserts that the circuit court's consideration of a COMPAS risk assessment at sentencing violates a defendant's right to due process. Additionally he contends that the circuit

---

[11] Pursuant to Wis. Stat. § (Rule) 809.61 (2013-14), the court of appeals certified an appeal of an order of the Circuit Court for La Crosse County, Scott Horne J., presiding.

[12] We are also asked to review whether the court of appeals' decision in State v. Samsa, 2015 WI App 6, 359 Wis. 2d 580, 859 N.W.2d 149, must be modified or overruled if this court determines that the right to due process prohibits consideration of COMPAS risk assessments at sentencing. For the reasons set forth below, we have not so determined and thus need not address this issue.

4

court erroneously exercised its discretion by assuming that the factual bases for the read-in charges were true.

¶8 Ultimately, we conclude that if used properly, observing the limitations and cautions set forth herein, a circuit court's consideration of a COMPAS risk assessment at sentencing does not violate a defendant's right to due process.

¶9 We determine that because the circuit court explained that its consideration of the COMPAS risk scores was supported by other independent factors, its use was not determinative in deciding whether Loomis could be supervised safely and effectively in the community. Therefore, the circuit court did not erroneously exercise its discretion. We further conclude that the circuit court's consideration of the read-in charges was not an erroneous exercise of discretion because it employed recognized legal standards.

¶10 Accordingly, we affirm the order of the circuit court denying Loomis's motion for post-conviction relief requesting a resentencing hearing.

I

¶11 The facts of this case are not in dispute. The State contends that Loomis was the driver in a drive-by shooting. It charged him with five counts, all as a repeater: (1) First-degree recklessly endangering safety (PTAC); (2) Attempting to flee or elude a traffic officer (PTAC); (3) Operating a motor vehicle without the owner's consent; (4) Possession of a firearm

by a felon (PTAC); (5) Possession of a short-barreled shotgun or rifle (PTAC).[13]

¶12 Loomis denies involvement in the drive-by shooting. He waived his right to trial and entered a guilty plea to only two of the less severe charges, attempting to flee a traffic officer and operating a motor vehicle without the owner's consent. The plea agreement stated that the other counts would be dismissed but read in:

> The other counts will be dismissed and read in for sentencing, although the defendant denies he had any role in the shooting, and only drove the car after the shooting occurred. The State believes he was the driver of the car when the shooting happened.
>
> The State will leave any appropriate sentence to the Court's discretion, but will argue aggravating and mitigating factors.

After accepting Loomis's plea, the circuit court ordered a presentence investigation. The Presentence Investigation Report ("PSI") included an attached COMPAS risk assessment.

¶13 COMPAS is a risk-need assessment tool designed by Northpointe, Inc. to provide decisional support for the Department of Corrections when making placement decisions, managing offenders, and planning treatment.[14] The COMPAS risk

---

[13] "PTAC" refers to party to a crime.

[14] Northpointe, Inc., Practitioner's Guide to COMPAS Core, at 1 (Mar. 19, 2015), http://www.northpointeinc.com/files/technical_documents/Practitioners-Guide-COMPAS-Core-_031915.pdf.

assessment is based upon information gathered from the defendant's criminal file and an interview with the defendant.

¶14 A COMPAS report consists of a risk assessment designed to predict recidivism and a separate needs assessment for identifying program needs in areas such as employment, housing and substance abuse.[15] The risk assessment portion of COMPAS generates risk scores displayed in the form of a bar chart, with three bars that represent pretrial recidivism risk, general recidivism risk, and violent recidivism risk.[16] Each bar indicates a defendant's level of risk on a scale of one to ten.[17]

¶15 As the PSI explains, risk scores are intended to predict the general likelihood that those with a similar history of offending are either less likely or more likely to commit another crime following release from custody. However, the COMPAS risk assessment does not predict the specific likelihood that an individual offender will reoffend. Instead, it provides a prediction based on a comparison of information about the individual to a similar data group.

¶16 Loomis's COMPAS risk scores indicated that he presented a high risk of recidivism on all three bar charts. His PSI included a description of how the COMPAS risk assessment should be used and cautioned against its misuse, instructing

---

[15] Id. at 12, 16.

[16] Id. at 3, 26.

[17] Id. at 8.

that it is to be used to identify offenders who could benefit from interventions and to target risk factors that should be addressed during supervision.

¶17 The PSI also cautions that a COMPAS risk assessment should not be used to determine the severity of a sentence or whether an offender is incarcerated:

> For purposes of Evidence Based Sentencing, actuarial assessment tools are especially relevant to: 1. Identify offenders who should be targeted for interventions. 2. Identify dynamic risk factors to target with conditions of supervision. 3. It is very important to remember that risk scores are not intended to determine the severity of the sentence or whether an offender is incarcerated.

(Emphasis added.)

¶18 At sentencing, the State argued that the circuit court should use the COMPAS report when determining an appropriate sentence:

> In addition, the COMPAS report that was completed in this case does show the high risk and the high needs of the defendant. There's a high risk of violence, high risk of recidivism, high pre-trial risk; and so all of these are factors in determining the appropriate sentence.

¶19 Ultimately, the circuit court referenced the COMPAS risk score along with other sentencing factors in ruling out probation:

> You're identified, through the COMPAS assessment, as an individual who is at high risk to the community.
>
> In terms of weighing the various factors, I'm ruling out probation because of the seriousness of the crime and because your history, your history on supervision,

and the risk assessment tools that have been utilized, suggest that you're extremely high risk to re-offend.

¶20 In addition to the COMPAS assessment, the circuit court considered the read-in charges at sentencing. For sentencing purposes, it assumed that the factual bases for the read-in charges were true and that Loomis was at least involved in conduct underlying the read-in charges. The circuit court explained further that Loomis "needs to understand that if these shooting related charges are being read in that I'm going to view that as a serious, aggravating factor at sentencing." Defense counsel protested the circuit court's assumption that the read-in charges were true and explained that Loomis did not concede that he was involved in the drive-by shooting.

¶21 Although a review of the transcript of the plea hearing reveals miscommunications and uncertainty about the consequences of a dismissed but read-in offense, the circuit court ultimately quoted directly from a then-recent decision of this court explaining the nature of such a read-in offense. It explained to Loomis that a circuit court can consider the read-in offense at sentencing and that such consideration could increase a defendant's sentence:

> The Court: Mr. Loomis, I just——there is a recent Supreme Court decision in State v. Frey that describes what a read-in offense is. And I just want to quote from that decision so that you fully understand it. . . .
>
> "[T]he defendant exposes himself to the likelihood of a higher sentence within the sentencing range and the additional possibility of restitution for the offenses that are 'read in.'"

9

So you're limited in this agreement to a sentencing range within——up to the maximums for the charges that you're pleading guilty. You're agreeing, as the Supreme Court decision indicates, that the charges can be read in and considered, and that has the effect of increasing the likelihood, the likelihood of a higher sentence within the sentencing range. You understand that?

Loomis: Yes.

¶22 The plea questionnaire/waiver of rights form stated that the maximum penalty Loomis faced for both charges was seventeen years and six months imprisonment. The court sentenced him within the maximum on the two charges for which he entered a plea.[18]

¶23 Loomis filed a motion for post-conviction relief requesting a new sentencing hearing. He argued that the circuit court's consideration of the COMPAS risk assessment at sentencing violated his due process rights. Loomis further asserted that the circuit court erroneously exercised its discretion by improperly assuming that the factual bases for the read-in charges were true.

¶24 The circuit court held two hearings on the post-conviction motion. At the first hearing, the circuit court addressed Loomis's claim that it had erroneously exercised its

---

[18] On the attempting to flee an officer charge, the circuit court sentenced Loomis to four years, with initial confinement of two years and extended supervision of two years. For operating a vehicle without the owner's consent, the circuit court sentenced Loomis to seven years, with four years of initial confinement and three years of extended supervision, to be served consecutively with the prior sentence.

discretion in how it considered the read-in charges. Considering the relevant case law and legal standards, the circuit court concluded that it had applied the proper standard and denied Loomis's motion on that issue.

¶25 During the first post-conviction motion hearing, the circuit court reviewed the plea hearing transcript and the sentencing transcript and explained that it did not believe Loomis's explanation:

> I felt Mr. Loomis's explanation was inconsistent with the facts. The State's version was more consistent with the facts and gave greater weight to the State's version at sentencing.

¶26 At the second hearing, the circuit court addressed the due process issues. The defendant offered the testimony of an expert witness, Dr. David Thompson, regarding the use at sentencing of a COMPAS risk assessment. Dr. Thompson opined that a COMPAS risk assessment should not be used for decisions regarding incarceration because a COMPAS risk assessment was not designed for such use. According to Dr. Thompson, a circuit court's consideration at sentencing of the risk assessment portions of COMPAS runs a "tremendous risk of over estimating an individual's risk and . . . mistakenly sentencing them or basing their sentence on factors that may not apply . . . ."

¶27 Dr. Thompson further testified that sentencing courts have very little information about how a COMPAS assessment analyzes the risk:

> The Court does not know how the COMPAS compares that individual's history with the population that it's comparing them with. The Court doesn't even know

11

whether that population is a Wisconsin population, a New York population, a California population. . . . There's all kinds of information that the court doesn't have, and what we're doing is we're mis-informing the court when we put these graphs in front of them and let them use it for sentence.

¶28 In denying the post-conviction motion, the circuit court explained that it used the COMPAS risk assessment to corroborate its findings and that it would have imposed the same sentence regardless of whether it considered the COMPAS risk scores. Loomis appealed and the court of appeals certified the appeal to this court.

II

¶29 Whether the circuit court's consideration of a COMPAS risk assessment violated Loomis's constitutional right to due process presents a question of law, which this court reviews independently of the determinations of a circuit court or a court of appeals. See Jackson v. Buchler, 2010 WI 135, ¶39, 330 Wis. 2d 279, 793 N.W.2d 826.

¶30 "This court reviews sentencing decisions under the erroneous exercise of discretion standard." State v. Frey, 2012 WI 99, ¶37, 343 Wis. 2d 358, 817 N.W.2d 436. An erroneous exercise of discretion occurs when a circuit court imposes a sentence "without the underpinnings of an explained judicial reasoning process." McCleary v. State, 49 Wis. 2d 263, 278, 182 N.W.2d 512 (1971); see also State v. Gallion, 2004 WI 42, ¶3, 270 Wis. 2d 535, 678 N.W.2d 197.

¶31 Additionally, a sentencing court erroneously exercises its discretion when its sentencing decision is not based on the

12

facts in the record or it misapplies the applicable law. State v. Travis, 2013 WI 38, ¶16, 347 Wis. 2d 142, 832 N.W.2d 491. It misapplies the law when it relies on clearly irrelevant or improper factors. McCleary, 49 Wis. 2d at 278. The defendant bears the burden of proving such reliance by clear and convincing evidence. State v. Harris, 2010 WI 79, ¶3, 326 Wis. 2d 685, 786 N.W.2d 409.

¶32 In a similar manner we review the issue of whether a circuit court erroneously exercises its discretion when it relies on the factual basis of the read-in charge when fashioning the defendant's sentence. Frey, 343 Wis. 2d 358, ¶¶37-39. "A discretionary sentencing decision will be sustained if it is based upon the facts in the record and relies on the appropriate and applicable law." Travis, 347 Wis. 2d 142, ¶16.

III

¶33 At the outset we observe that the defendant is not challenging the use of a COMPAS risk assessment for decisions other than sentencing, and he is not challenging the use of the needs portion of the COMPAS report at sentencing. Instead, Loomis challenges only the use of the risk assessment portion of the COMPAS report at sentencing.

¶34 Specifically, Loomis asserts that the circuit court's use of a COMPAS risk assessment at sentencing violates a defendant's right to due process for three reasons: (1) it violates a defendant's right to be sentenced based upon accurate information, in part because the proprietary nature of COMPAS prevents him from assessing its accuracy; (2) it violates a

13

defendant's right to an individualized sentence; and (3) it improperly uses gendered assessments in sentencing.

¶35 Although we ultimately conclude that a COMPAS risk assessment can be used at sentencing, we do so by circumscribing its use. Importantly, we address how it can be used and what limitations and cautions a circuit court must observe in order to avoid potential due process violations.

¶36 It is helpful to consider Loomis's due process arguments in the broader context of the evolution of evidence-based sentencing. Wisconsin has been at the forefront of advancing evidence-based practices. In 2004, this court's Planning and Policy Advisory Committee (PPAC) created a subcommittee "to explore and assess the effectiveness of policies and programs . . . designed to improve public safety and reduce incarceration."[19]

¶37 From that initial charge, Wisconsin's commitment to evidence-based practices and its leadership role have been well

---

[19] Supreme Court of Wisconsin, Planning and Policy Advisory Committee (PPAC), Effective Justice Strategies Subcommittee, Phase I: June 2004——June 2007 Insights and Recommendations, at 3-4, https://www.wicourts.gov/courts/programs/docs/phase1final report.pdf.

documented.[20]  Initially, a variety of risk and needs assessment tools were used by various jurisdictions within the state.  In 2012, however, the Wisconsin Department of Corrections selected COMPAS as the statewide assessment tool for its correctional officers, providing assessment of risk probability for pretrial release misconduct and general recidivism.[21]

¶38 The question of whether COMPAS can be used at sentencing has previously been addressed.  In State v. Samsa, 2015 WI App 6, 359 Wis. 2d 580, 859 N.W.2d 149, the court of appeals approved of a circuit court's consideration of a COMPAS assessment at sentencing.  However, it was not presented with the due process implications that we face here.  Citing to a principle for sentencing courts set forth in State v. Gallion, 2002 WI App 265, ¶26, 258 Wis. 2d 473, 654 N.W.2d 446, aff'd, 2004 WI 42, 270 Wis. 2d 535, 678 N.W.2d 197, the Samsa court

---

[20] See generally Suzanne Tallarico et. al., National Center for State Courts (NCSC), Court Services Division, Effective Justice Strategies in Wisconsin: A Report of Findings and Recommendations (2012), https://www.wicourts.gov/courts/programs/docs/ejsreport.pdf; Supreme Court of Wisconsin, Planning and Policy Advisory Committee (PPAC), Effective Justice Strategies Subcommittee, Phase II: Progress and Accomplishments (Nov. 13, 2013), https://www.wicourts.gov/courts/programs/docs/finalreport.pdf; Casey, Using Offender Risk and Needs Assessment Information at Sentencing, supra note 7, at 41.

[21] Pamela M. Casey et al., National Center for State Courts (NCSC), Center for Sentencing Initiatives, Research Division, Use of Risk and Needs Assessment Information at Sentencing: La Crosse County, Wisconsin at 3 (Jan. 2014), http://www.ncsc.org/~/media/Microsites/Files/CSI/RNA%20Brief%20-%20La%20Crosse%20County%20WI%20csi.ashx.

15

emphasized that "COMPAS is merely one tool available to a court at the time of sentencing."  359 Wis. 2d 580, ¶13.

¶39  In Gallion we warned of ad hoc decision making at sentencing:  "Experience has taught us to be cautious when reaching high consequence conclusions about human nature that seem to be intuitively correct at the moment.  Better instead is a conclusion that is based on more complete and accurate information . . . ."  270 Wis. 2d 535, ¶36.  We encouraged circuit courts to seek "more complete information upfront, at the time of sentencing.  Judges would be assisted in knowing about a defendant's propensity for causing harm [and] the circumstances likely to precipitate the harm . . . ."  Id., ¶34.

¶40  Concern about ad hoc decision making is justified.  A myriad of determinations are made throughout the criminal justice system without consideration of tested facts of any kind.  Questions such as whether to require treatment, if so what kind, and how long supervision should last often have been left to a judge's intuition or a correctional officer's standard practice.

¶41  The need to have additional sound information is apparent for those working in corrections, but that need is even more pronounced for sentencing courts.  Sentencing decisions are guided by due process protections that may not

16

apply to many run of the mill correctional decisions.[22] This distinction is of import given that the risk and needs assessment tools were designed for use by those within the Department of Corrections and that design is being transitioned to a sentencing venue governed by different guiding principles.

¶42 In response to a call to reduce recidivism by employing evidence-based practices, several states have passed legislation requiring that judges be provided with risk assessments and recidivism data at sentencing.[23] Other states

---

[22] The process that is due under the Constitution differs with the types of decisions and proceedings involved. "Due process is flexible and calls for such procedural protections as the particular situation demands." Schweiker v. McClure, 456 U.S. 188, 200 (1982); see also Londoner v. City and Cty. of Denver, 210 U.S. 373, 386 (1908) ("Many requirements essential in strictly judicial proceedings may be dispensed with [in the administrative forum]").

[23] See, e.g., Ky. Rev. Stat. Ann. § 532.007(3)(a) (2016) (sentencing judges in Kentucky shall consider the results of a defendant's risk and needs assessment included in the presentence investigation); Ohio Rev. Code Ann. § 5120.114(A)(1)-(3) (2015-16) (the Ohio department of rehabilitation and correction "shall select a single validated risk assessment tool for adult offenders" that shall be used for purposes including sentencing); 42 PA. Cons. Stat. § 2154.7(a) (2016) (in Pennsylvania, a risk assessment instrument shall be adopted to help determine appropriate sentences). See also Ariz. Code of Judicial Admin. § 6-201.01(J)(3) (2016) ("For all probation eligible cases, presentence reports shall [] contain case information related to criminogenic risk and needs as documented by the standardized risk assessment and other file and collateral information"); Okla. Stat. tit. 22, § 988.18(B) (2016) (an assessment and evaluation instrument designed to predict risk to recidivate is required to determine eligibility for any community punishment).

17

permit, but do not mandate, the use of risk assessment tools at sentencing.[24]

¶43 But other voices are challenging the efficacy of evidence-based sentencing and raise concern about overselling the results. They urge that judges be made aware of the limitations of risk assessment tools, lest they be misused:

> In the main, [supporters] have been reticent to acknowledge the paucity of reliable evidence that now exists, and the limits of the interventions about which we do possess evidence. Unless criminal justice system actors are made fully aware of the limits of the tools they are being asked to implement, they are likely to misuse them.

Cecelia Klingele, The Promises and Perils of Evidence-Based Corrections, 91 Notre Dame L. Rev. 537, 576 (2015).

---

[24] See, e.g., Idaho Code § 19-2517 (2016) (if an Idaho court orders a presentence investigation, the investigation report for all offenders sentenced directly to a term of imprisonment and for certain offenders placed on probation must include current recidivism rates differentiated based on offender risk levels of low, moderate, and high); Malenchik v. State, 928 N.E.2d 564, 566, 571-73, 575 (Ind. 2010) (encouraging the use of evidence based offender assessment instruments at sentencing); La. Stat. Ann. § 15:326(A) (2016) (some Louisiana courts may use a single presentence investigation validated risk and needs assessment tool prior to sentencing an adult offender eligible for assessment); Wash. Rev. Code § 9.94A.500(1) (2016) (requiring a court to consider risk assessment reports at sentencing if available); State v. Rogers, No. 14-0373, 2015 WL 869323, at *4 (W. Va. Jan. 9, 2015) (Loughry, J., concurring) (in an unpublished Memorandum Decision, the Supreme Court of Appeals of West Virginia explained that although probation officers are required to conduct standardized risk and needs assessments pursuant to W. Va. Code § 62-12-6(a)(2) (2016), the use of these tools at sentencing to inform sentencing decisions is left to the discretion of the circuit court).

¶44 We heed this admonition. The DOC already recognizes limitations on the PSI, instructing that "[i]t is very important to remember that risk scores are not intended to determine the severity of the sentence or whether an offender is incarcerated." We are in accord with these limitations. Further, we set forth the corollary limitation that risk scores may not be considered as the determinative factor in deciding whether the offender can be supervised safely and effectively in the community.[25]

¶45 In addressing Loomis's due process arguments below, we additionally raise cautions that a sentencing court must observe in order to avoid potential due process violations.

IV

¶46 We turn to address Loomis's first argument that a circuit court's consideration of a COMPAS risk assessment violates a defendant's due process right to be sentenced based on accurate information. Loomis advances initially that the proprietary nature of COMPAS prevents a defendant from challenging the scientific validity of the risk assessment. Accordingly, Loomis contends that because a COMPAS risk assessment is attached to the PSI, a defendant is denied full access to information in the PSI and therefore cannot ensure that he is being sentenced based on accurate information.

---

[25] See Casey, Using Offender Risk and Needs Assessment Information at Sentencing, supra note 7, at 14.

19

¶47 It is well-established that "[a] defendant has a constitutionally protected due process right to be sentenced upon accurate information." Travis, 347 Wis. 2d 142, ¶17. Additionally, the right to be sentenced based upon accurate information includes the right to review and verify information contained in the PSI upon which the circuit court bases its sentencing decision. State v. Skaff, 152 Wis. 2d 48, 53, 447 N.W.2d 84 (Ct. App. 1989).

¶48 In Gardner v. Florida, 430 U.S. 349, 351 (1977) (Stevens, J., plurality opinion), the circuit court imposed the death sentence, relying in part on information in a presentence investigation report that was not disclosed to counsel for the parties. The plurality opinion concluded that the defendant "was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." Id. at 362.

¶49 Following Gardner, the Wisconsin court of appeals determined that it was an erroneous exercise of discretion for the circuit court to categorically deny disclosure of the PSI to a defendant.[26] Skaff, 152 Wis. 2d at 58. The Skaff court explained that if the PSI was incorrect or incomplete, no person was in a better position than the defendant to refute, explain,

---

[26] Although Gardner v. Florida, 430 U.S. 349 (1977) was a death penalty case, State v. Skaff, 152 Wis. 2d 48, 55 447 N.W.2d 84 (Ct. App. 1989), determined that "we perceive no reason why its rationale should not be applied to penalties of lesser severity."

or supplement the PSI. <u>Id.</u> at 57. Accordingly, until the defendant reviews his PSI, its accuracy cannot be verified. <u>Id.</u> at 58.

¶50 <u>Skaff</u> reasoned that given the discretion accorded the circuit court in sentencing decisions, any significant inaccuracies would likely affect the defendant's sentence. <u>Id.</u> Therefore, denial of access to the PSI denied the defendant "an essential factor of due process, i.e., a procedure conducive to sentencing based on correct information." <u>Id.</u> at 57 (citing <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (1976)).

¶51 Loomis analogizes the COMPAS risk assessment to the PSI in <u>Gardner</u> and <u>Skaff</u>. Northpointe, Inc., the developer of COMPAS, considers COMPAS a proprietary instrument and a trade secret. Accordingly, it does not disclose how the risk scores are determined or how the factors are weighed. Loomis asserts that because COMPAS does not disclose this information, he has been denied information which the circuit court considered at sentencing.

¶52 He argues that he is in the best position to refute or explain the COMPAS risk assessment, but cannot do so based solely on a review of the scores as reflected in the bar charts. Additionally, Loomis contends that unless he can review how the

21

factors are weighed and how risk scores are determined, the accuracy of the COMPAS assessment cannot be verified.[27]

¶53 Loomis's analogy to Gardner and Skaff is imperfect. Although Loomis cannot review and challenge how the COMPAS algorithm calculates risk, he can at least review and challenge the resulting risk scores set forth in the report attached to the PSI. At the heart of Gardner and Skaff is the fact that the court relied on information the defendant did not have any opportunity to refute, supplement or explain. Gardner, 430 U.S. at 362. That is not the case here.

¶54 Loomis is correct that the risk scores do not explain how the COMPAS program uses information to calculate the risk scores. However, Northpointe's 2015 Practitioner's Guide to COMPAS explains that the risk scores are based largely on static information (criminal history), with limited use of some dynamic variables (i.e. criminal associates, substance abuse).[28]

¶55 The COMPAS report attached to Loomis's PSI contains a list of 21 questions and answers regarding these static factors such as:

---

[27] In a similar vein, Loomis asserts that the COMPAS assessment would not pass the Daubert test and therefore would be inadmissible at trial. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). Given that the rules of evidence do not apply at sentencing, we need not address that argument here. State v. Straszkowski, 2008 WI 65, ¶52, 310 Wis. 2d 259, 750 N.W.2d 835.

[28] Northpointe, Inc., supra note 14, at 12, 27.

- How many times has this person been returned to custody while on parole? 5+

- How many times has this person had a new charge/arrest while on probation? 4

- How many times has this person been arrested before as an adult or juvenile (criminal arrest only)? 12

Thus, to the extent that Loomis's risk assessment is based upon his answers to questions and publicly available data about his criminal history, Loomis had the opportunity to verify that the questions and answers listed on the COMPAS report were accurate.

¶56 Additionally, this is not a situation in which portions of a PSI are considered by the circuit court, but not released to the defendant. The circuit court and Loomis had access to the same copy of the risk assessment. Loomis had an opportunity to challenge his risk scores by arguing that other factors or information demonstrate their inaccuracy.

¶57 Yet, regardless of whether Gardner and Skaff are analogous to this case, Loomis correctly asserts that defendants have the right to be sentenced based on accurate information. Travis, 347 Wis. 2d 142, ¶17.

¶58 Some states that use COMPAS have conducted validation studies of COMPAS concluding that it is a sufficiently accurate

23

risk assessment tool.[29]  New York State's Division of Criminal Justice Services conducted a study examining a COMPAS assessment's recidivism scale's effectiveness and predictive accuracy and concluded that "the Recidivism Scale worked effectively and achieved satisfactory predictive accuracy."[30] Unlike New York and other states, Wisconsin has not yet completed a statistical validation study of COMPAS for a Wisconsin population.[31]

¶59 However, Loomis relies on other studies of risk assessment tools that have raised questions about their

---

[29] This analysis references current research studies in order to caution sentencing courts regarding concerns that have been raised about evidence-based risk assessment tools such as COMPAS.  However, we are not in a position to evaluate or opine on the scientific reliability of this data.  Accordingly, this opinion should not be read as an endorsement of any particular research study or article, regardless of whether its conclusion is critical or supportive of the COMPAS risk assessment tool.

[30] Sharon Lansing, New York State Division of Criminal Justice Services, Office of Justice Research and Performance, New York State COMPAS-Probation Risk and Need Assessment Study: Examining the Recidivism Scale's Effectiveness and Predictive Accuracy, at i, 18 (September 2012), http://www.northpointeinc.com/downloads/research/DCJS_OPCA_COMPAS_Probation_Validity.pdf.

[31] See, e.g., Julia Angwin et al., ProPublica, Machine Bias (May 23, 2016), https://www.propublica.org/article/machine-bias-risk-assessments-in-criminal-sentencing.  See also Lansing, supra note 30; Thomas Blomberg, et at., Broward Sheriff's Office, Department of Community Control, Validation of the COMPAS Risk Assessment Classification Instrument (Sept. 2010), http://criminology.fsu.edu/wp-content/uploads/Validation-of-the-COMPAS-Risk-Assessment-Classification-Instrument.pdf.

24

accuracy.[32]   For example, he cites to a 2007 California Department of Corrections and Rehabilitation ("CDCR") study which concludes that although COMPAS appears to be assessing criminogenic needs and recidivism risk, "there is little evidence that this is what [] COMPAS actually assesses."[33]

¶60 The California Study reached the further conclusion that there "is no sound evidence that the COMPAS can be rated consistently by different evaluators, that it assesses the criminogenic needs it purports to assess, and (most importantly) that it predicts inmates' recidivism for CDCR offenders."[34] Ultimately, the authors of the study could not recommend that CDCR use COMPAS for individuals.[35]

---

[32] The State acknowledges that no method of risk assessment is without error.  For example, the State cites to a primer on COMPAS which summarizes multiple studies that have assessed COMPAS's predictive validity as moderate, with scores ranging from .50-.73.   Pamela M. Casey, et al., National Center for State Courts (NCSC), Offender Risk & Needs Assessment Instruments:   A Primer for Courts at A-23 (2014), http://www.ncsc.org/~/media/Microsites/Files/CSI/BJA%20RNA%20Final%20Report_Combined%20Files%208-22-14.ashx.   However, it also summarizes other studies that assign COMPAS higher scores of .70 for internal consistency and .70-1.0 for re-test reliability. Id.

[33] Jennifer L. Skeem and Jennifer Eno Loudon, Report Prepared for the California Department of Corrections and Rehabilitation (CDCR), Assessment of Evidence on the Quality of the Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) at 5 (2007), http://www.cdcr.ca.gov/adult_research_branch/Research_Documents/COMPAS_Skeem_EnoLouden_Dec_2007.pdf.

[34] Id.

[35] Id.

¶61 Subsequently, however, the CDCR published its 2010 final report on California's COMPAS validation study.[36] The 2010 study concluded that although not perfect, "COMPAS is a reliable instrument. . . ."[37] Specifically, it explained that the general recidivism risk scale achieved the value of .70, which is the conventional standard, though the violence risk scale did not.[38]

¶62 In addition to these problems, there is concern that risk assessment tools may disproportionately classify minority offenders as higher risk, often due to factors that may be outside their control, such as familial background and education.[39] Other state studies indicate that COMPAS is more predictive of recidivism among white offenders than black offenders.[40]

¶63 A recent analysis of COMPAS's recidivism scores based upon data from 10,000 criminal defendants in Broward County, Florida, concluded that black defendants "were far more likely

---

[36] David Farabee et al., California Department of Corrections and Rehabilitation, COMPAS Validation Study: Final Report (Aug. 15, 2010), http://www.cdcr.ca.gov/adult_research_branch/Research_Documents/COMPAS_Final_report_08-11-10.pdf.

[37] Id. at 29.

[38] Id.

[39] Cecelia Klingele, The Promises and Perils of Evidence-Based Corrections, 91 Notre Dame L. Rev. 537, 577 (2015).

[40] See e.g., Angwin, supra note 31; Tracy L. Fass, et al., The LSI-R and the Compas: Validation Data on Two Risk-Needs Tools, 35 Crim. Justice & Behavior 1095, 1100-01 (2008).

than white defendants to be incorrectly judged to be at a higher risk of recidivism."[41] Likewise, white defendants were more likely than black defendants to be incorrectly flagged as low risk.[42] Although Northpointe disputes this analysis, this study and others raise concerns regarding how a COMPAS assessment's risk factors correlate with race.[43]

¶64 Additional concerns are raised about the need to closely monitor risk assessment tools for accuracy. At least one commentator has explained that in order to remain accurate, risk assessment tools "must be constantly re-normed for changing populations and subpopulations." Klingele, The Promises and Perils of Evidence-Based Corrections, 91 Notre Dame L. Rev. at 576. Accordingly, jurisdictions that utilize risk assessment tools must ensure they have the capacity for maintaining those tools and monitoring their continued accuracy. Id. at 577.

¶65 Focusing exclusively on its use at sentencing and considering the expressed due process arguments regarding accuracy, we determine that use of a COMPAS risk assessment must be subject to certain cautions in addition to the limitations set forth herein.

---

[41] Jeff Larson et al., ProPublica, How We Analyzed the COMPAS Recidivism Algorithm (May 23, 2016), https://www.propublica.org/article/how-we-analyzed-the-compas-recidivism-algorithm.

[42] Id.

[43] Northpointe, Inc., supra note 14, at 14.

27

¶66 Specifically, any PSI containing a COMPAS risk assessment must inform the sentencing court about the following cautions regarding a COMPAS risk assessment's accuracy: (1) the proprietary nature of COMPAS has been invoked to prevent disclosure of information relating to how factors are weighed or how risk scores are to be determined; (2) risk assessment compares defendants to a national sample, but no cross-validation study for a Wisconsin population has yet been completed; (3) some studies of COMPAS risk assessment scores have raised questions about whether they disproportionately classify minority offenders as having a higher risk of recidivism; and (4) risk assessment tools must be constantly monitored and re-normed for accuracy due to changing populations and subpopulations. Providing information to sentencing courts on the limitations and cautions attendant with the use of COMPAS risk assessments will enable courts to better assess the accuracy of the assessment and the appropriate weight to be given to the risk score.

V

¶67 We address next Loomis's argument that a circuit court's consideration of a COMPAS risk assessment amounts to sentencing based on group data, rather than an individualized sentence based on the charges and the unique character of the defendant. As this court explained in Gallion, individualized sentencing "has long been a cornerstone to Wisconsin's criminal justice jurisprudence." 270 Wis. 2d 535, ¶48.

28

¶68 If a COMPAS risk assessment were the determinative factor considered at sentencing this would raise due process challenges regarding whether a defendant received an individualized sentence. As the defense expert testified at the post-conviction motion hearing, COMPAS is designed to assess group data. He explained that COMPAS can be analogized to insurance actuarial risk assessments, which identify risk among groups of drivers and allocate resources accordingly.

¶69 Similarly, the 2015 Practitioner's Guide to COMPAS explains that "[r]isk assessment is about predicting group behavior . . . it is not about prediction at the individual level."[44] Risk scales are able to identify groups of high-risk offenders—not a particular high-risk individual.[45] A pointed example of potential misunderstanding arising from the use of group data is that an individual who has never committed a violent offense may nevertheless be labeled as a high risk for recidivism on the violent risk scale. As the DOC explains: "[a]n offender who is young, unemployed, has an early age-at-first-arrest and a history of supervision failure, will score medium or high on the Violence Risk Scale even though the offender never had a violent offense."[46]

---

[44] Northpointe, Inc., supra note 14, at 31.

[45] Id.

[46] State of Wisconsin, Department of Corrections, Electronic Case Reference Manual, COMPAS Assessment Frequently Asked Questions, http://doc.helpdocsonline.com/dcc-business-process.

¶70 To ameliorate this problem, the DOC explains that "staff are predicted to disagree with an actuarial risk assessment (e.g. COMPAS) in about 10% of the cases due to mitigating or aggravating circumstances to which the assessment is not sensitive."[47] Thus, "staff should be encouraged to use their professional judgment and override the computed risk as appropriate . . . ."[48]

¶71 Just as corrections staff should disregard risk scores that are inconsistent with other factors, we expect that circuit courts will exercise discretion when assessing a COMPAS risk score with respect to each individual defendant.

¶72 Ultimately, we disagree with Loomis because consideration of a COMPAS risk assessment at sentencing along with other supporting factors is helpful in providing the sentencing court with as much information as possible in order to arrive at an individualized sentence. In Gallion, this court explained that circuit courts "have an enhanced need for more complete information upfront, at the time of sentencing." 270 Wis. 2d 535, ¶34.

¶73 COMPAS has the potential to provide sentencing courts with more complete information to address this enhanced need. The Indiana Supreme Court examined similar risk assessment tools

---

[47] Id.

[48] Northpointe, Inc., supra note 14, at 31.

and explained that these tools assist courts in weighing all the sentencing factors:

> Such assessment instruments enable a sentencing judge to more effectively evaluate and weigh several express statutory sentencing considerations such as criminal history, the likelihood of affirmative response to probation or short term imprisonment, and the character and attitudes indicating that a defendant is unlikely to commit another crime.

Malenchik v. State, 928 N.E.2d 564, 574 (Ind. 2010) (internal quotations omitted).

¶74 However the due process implications compel us to caution circuit courts that because COMPAS risk assessment scores are based on group data, they are able to identify groups of high-risk offenders——not a particular high-risk individual. Accordingly, a circuit court is expected to consider this caution as it weighs all of the factors that are relevant to sentencing an individual defendant.

VI

¶75 We turn now to address Loomis's argument that a COMPAS risk assessment's use of gender violates a defendant's due process rights. Relying on Harris, 326 Wis. 2d 685, ¶33, Loomis asserts that because COMPAS risk scores take gender into account, a circuit court's consideration of a COMPAS risk assessment violates a defendant's due process right not to be sentenced on the basis of gender.

¶76 Due to the proprietary nature of COMPAS, the parties dispute the specific method by which COMPAS considers gender. Loomis asserts that it is unknown exactly how COMPAS uses

31

gender, but contends that COMPAS considers gender as a criminogenic factor. The State disagrees, contending that the DOC uses the same COMPAS risk assessment on both men and women, but then compares each offender to a "norming" group of his or her own gender.

¶77 Regardless of whether gender is used as a criminogenic factor or solely for statistical norming, Loomis objects to any use of gender in calculating COMPAS's risk scores. In response, the State contends that considering gender in a COMPAS risk assessment is necessary to achieve statistical accuracy. The State argues that because men and women have different rates of recidivism and different rehabilitation potential, a gender neutral risk assessment would provide inaccurate results for both men and women.

¶78 Both parties appear to agree that there is statistical evidence that men, on average, have higher recidivism and violent crime rates compared to women. Commentators also have noted and discussed statistical evidence differentiating men and women in this context. See, e.g., Sonja B. Starr, Evidence-Based Sentencing and the Scientific Rationalization of Discrimination, 66 Stan. L. Rev. 803, 813 (2014) ("if the instrument includes gender, men will always receive higher risk scores than otherwise-identical women (because, averaged across all cases, men have higher recidivism rates . . . "); John Monahan, A Jurisprudence of Risk Assessment: Forecasting Harm Among Prisoners, Predators, and Patients, 92 Va. L. Rev. 391, 416 (2006) ("That women commit violent acts at a much lower rate

32

than men is a staple in criminology and has been known for as long as official records have been kept.").

¶79 However, Loomis asserts that even if statistical generalizations based on gender are accurate, they are not necessarily constitutional. He cites to Craig v. Boren, 429 U.S. 190, 208-210 (1976), a case where the United States Supreme Court concluded that an Oklahoma law that prohibited the sale of 3.2% beer to men under the age 21 and to women under the age of 18 violated the equal protection clause of the Fourteenth Amendment. The Court explained that although state officials offered sociological or empirical justifications for the gender-based difference in the law, "the principles embodied in the Equal Protection Clause are not to be rendered inapplicable by statistically measured but loose-fitting generalities concerning the drinking tendencies of aggregate groups." Id. at 208-09.

¶80 Notably, however, Loomis does not bring an equal protection challenge in this case. Thus, we address whether Loomis's constitutional due process right not to be sentenced on the basis of gender is violated if a circuit court considers a COMPAS risk assessment at sentencing. See Harris, 326 Wis. 2d 685, ¶33.

¶81 Loomis misinterprets Harris in arguing that a sentencing court cannot consider a COMPAS risk assessment because it takes gender into account in calculating risk scores. In Harris, the defendant asserted that the circuit court imposed its sentence on the basis of gender when it criticized him for being unemployed while his child's mother worked. Id., ¶61.

33

Harris argued that he should not be penalized for being a stay-at-home father and that the circuit court used this fact as an aggravating factor when fashioning his sentence. Id.

¶82 In determining whether the circuit court improperly considered gender in sentencing Harris, this court concluded that there was a factual basis underlying the circuit court's statements that was not related to Harris's gender. Id., ¶¶62-63. The record revealed that Harris was not his daughter's stay-at-home primary caregiver and that other factors demonstrated that he was not a responsible father. Id., ¶63.

¶83 Likewise, there is a factual basis underlying COMPAS's use of gender in calculating risk scores. Instead, it appears that any risk assessment tool which fails to differentiate between men and woman will misclassify both genders. As one commenter noted, "the failure to take gender into consideration, at least when predicting recidivism risk, itself is unjust." Melissa Hamilton, Risk-Needs Assessment: Constitutional and Ethical Challenges, 52 Am. Crim. L. Rev. 231, 255 (Spring 2015). Thus, if the inclusion of gender promotes accuracy, it serves the interests of institutions and defendants, rather than a discriminatory purpose. Id.

¶84 Additionally, Harris concluded that the defendant had not met his burden of proving by clear and convincing evidence that the circuit court actually relied on gender as a factor in imposing its sentence. 326 Wis. 2d 685, ¶64. It explained that the "circuit court considered the proper factors—it evaluated the gravity of the offense, Harris's character, and the public's

34

need for protection." Id., ¶¶65, 67. "The circuit court thoroughly explained its reasons for the sentence it imposed, and all of the potentially offensive comments flagged by both Harris and the court of appeals bear a reasonable nexus to proper sentencing factors." Id., ¶67.

¶85 Here, as in Harris, Loomis has not met his burden of showing that the circuit court actually relied on gender as a factor in imposing its sentence. The circuit court explained that it considered multiple factors that supported the sentence it imposed:

> In terms of weighing the various factors, I'm ruling out probation because of the seriousness of the crime and because your history, your history on supervision, and the risk assessment tools that have been utilized, suggest that you're extremely high risk to re-offend.

In addition to the COMPAS risk assessment, the seriousness of the crime and Loomis's criminal history both bear a nexus to the sentence imposed. See Gallion, 270 Wis. 2d 535, ¶46 ("we require that the court, by reference to the relevant facts and factors, explain how the sentence's component parts promote the sentencing objectives."). See also Harris v. State, 75 Wis. 2d 513, 519, 250 N.W.2d 7 (1977) (relevant sentencing factors include past record of criminal offenses, history of undesirable behavior patterns, and results of presentence investigation).

¶86 We determine that COMPAS's use of gender promotes accuracy that ultimately inures to the benefit of the justice system including defendants. Additionally, we determine that

35

the defendant failed to meet his burden of showing that the sentencing court actually relied on gender as a factor in sentencing. Thus, we conclude that the use of the COMPAS risk assessment at sentencing did not violate Loomis's right to due process.

VII

¶87 Next, we address the permissible uses for a COMPAS risk assessment at sentencing. Then we set forth the limitations and cautions that a sentencing court must observe when using COMPAS.

¶88 Although it cannot be determinative, a sentencing court may use a COMPAS risk assessment as a relevant factor for such matters as: (1) diverting low-risk prison-bound offenders to a non-prison alternative; (2) assessing whether an offender can be supervised safely and effectively in the community; and (3) imposing terms and conditions of probation, supervision, and responses to violations.[49]

¶89 First, COMPAS may be useful in identifying prison-bound offenders who are at low risk to reoffend for purposes of diverting them to non-prison alternatives and aids in the decision of whether to suspend all or part of an offender's sentence.[50]

---

[49] Tallarico, _supra_ note 20, at 20-21.

[50] Casey, _Using Offender Risk and Needs Assessment Information at Sentencing_, _supra_ note 7, at 8, 9, 13.

¶90 Second, risk assessment tools such as COMPAS can be helpful to assess an offender's risk to public safety and can inform the decision of whether the risk of re-offense presented by the offender can be safely managed and effectively reduced through community supervision and services.[51]

¶91 Third, COMPAS may be used to inform decisions about the terms and conditions of probation and supervision.[52] Risk assessments can be useful in identifying low-risk offenders who do not require intensive supervision and treatment programs.[53] Together with a need assessment, a risk assessment may inform public safety considerations related to offender risk management, and therefore may be used to provide guidance about the level of supervision and control needed for an offender placed on probation or released to extended supervision.[54] Specifically, it may inform decisions such as reporting requirements, drug testing, electronic monitoring, community service, and the most appropriate treatment strategies.[55]

¶92 Thus, a COMPAS risk assessment may be used to "enhance a judge's evaluation, weighing, and application of the other

---

[51] Id. at 9, 13-14.

[52] Id. at 16.

[53] Id.

[54] Id. at 11; Casey, Offender Risk & Needs Assessment Instruments: A Primer for Courts, supra note 32, at 2.

[55] Casey, Using Offender Risk and Needs Assessment Information at Sentencing, supra note 7, at 14, 16.

sentencing evidence in the formulation of an individualized sentencing program appropriate for each defendant." See Malenchick, 928 N.E.2d at 573. As the court of appeals explained in Samsa, "COMPAS is merely one tool available to a court at the time of sentencing and a court is free to rely on portions of the assessment while rejecting other portions." 359 Wis. 2d 580, ¶13.

¶93 However, the use of a COMPAS risk assessment at sentencing must be subject to certain limitations. As noted above, the DOC already recognizes these limitations on the PSI, instructing that "[i]t is very important to remember that risk scores are not intended to determine the severity of the sentence or whether an offender is incarcerated." This is also the first "Guiding Principle" of the National Center for State Courts ("NCSC") report on using offender risk and needs assessment at sentencing, which instructs that:

> Risk and need assessment information should be used in the sentencing decision to inform public safety considerations related to offender risk reduction and management. It should not be used as an aggravating or mitigating factor in determining the severity of an offender's sanction.[56]

¶94 Additionally, we set forth the corollary limitation that risk scores may not be used as the determinative factor in deciding whether the offender can be supervised safely and

---

[56] Id. at 11.

38

effectively in the community. This is consistent with the second "Guiding Principle" of the National Center for State Courts.[57]

¶95 The decision of the Indiana Supreme Court in Malenchik, 928 N.E.2d at 575, provides additional guidance here. It limited the use of risk assessments, explaining that they "are not intended to serve as aggravating or mitigating circumstances nor to determine the gross length of sentence, but a trial court may employ such results in formulating the manner in which a sentence is to be served."

¶96 Additionally, a COMPAS risk assessment was not designed to address all of the goals of a sentence. Its aim is addressing the treatment needs of an individual and identifying the risk of recidivism. Sentencing, on the other hand, is meant to address additional purposes. See State v. Dowdy, 2012 WI 12, ¶97, 338 Wis. 2d 565, 808 N.W.2d 691 (Abrahamson, C.J., dissenting) ("It is commonly understood that there are four main purposes of sentencing: (1) deterrence; (2) rehabilitation; (3) retribution; and (4) segregation.").

¶97 Because of these disparate goals, using a risk assessment tool to determine the length and severity of a sentence is a poor fit. As scholars have observed, "[a]ssessing the risk of future crime plays no role in sentencing decisions based solely on backward-looking perceptions of blameworthiness, . . . is not relevant to deterrence, . . . and should not be

---

[57] Id. at 14.

39

used to sentence offenders to more time than they morally deserve."[58]

¶98 Thus, a sentencing court may consider a COMPAS risk assessment at sentencing subject to the following limitations. As recognized by the Department of Corrections, the PSI instructs that risk scores may not be used: (1) to determine whether an offender is incarcerated; or (2) to determine the severity of the sentence. Additionally, risk scores may not be used as the determinative factor in deciding whether an offender can be supervised safely and effectively in the community.[59]

¶99 Importantly, a circuit court must explain the factors in addition to a COMPAS risk assessment that independently support the sentence imposed. A COMPAS risk assessment is only one of many factors that may be considered and weighed at sentencing.

¶100 Any Presentence Investigation Report ("PSI") containing a COMPAS risk assessment filed with the court must

---

[58] John Monahan and Jennifer L. Skeem, Risk Assessment in Criminal Sentencing, 12 Annual Rev. Clinical Psychol. 489, 492-93. See also Melissa Hamilton, Risk-Needs Assessment: Constitutional and Ethical Challenges, 52 Am. Crim. L. Rev. 231, 277 (2015) ("Retributive and deterrence orientations are less amenable to evidence-based practices").

[59] Casey, Using Offender Risk and Needs Assessment Information at Sentencing, supra note 7, at 14.

contain a written advisement listing the limitations.[60] Additionally, this written advisement should inform sentencing courts of the following cautions as discussed throughout this opinion:

- The proprietary nature of COMPAS has been invoked to prevent disclosure of information relating to how factors are weighed or how risk scores are determined.

- Because COMPAS risk assessment scores are based on group data, they are able to identify groups of high-risk offenders——not a particular high-risk individual.

- Some studies of COMPAS risk assessment scores have raised questions about whether they disproportionately classify minority offenders as having a higher risk of recidivism.

- A COMPAS risk assessment compares defendants to a national sample, but no cross-validation study for a Wisconsin population has yet been completed. Risk assessment tools must be constantly monitored and re-normed for accuracy due to changing populations and subpopulations.

---

[60] A circuit court may order a presentence investigation pursuant to Wis. Stat. § 972.15(1). When filed with the court, any presentence investigative report that attaches or incorporates a COMPAS risk assessment must contain, consistent with due process, a written advisement regarding the cautions and limitations.

41

- COMPAS was not developed for use at sentencing, but was intended for use by the Department of Corrections in making determinations regarding treatment, supervision, and parole.

¶101 It is important to note that these are the cautions that have been identified in the present moment.  For example, if a cross-validation study for a Wisconsin population is conducted, then flexibility is needed to remove this caution or explain the results of the cross-validation study.  Similarly, this advisement should be regularly updated as other cautions become more or less relevant as additional data becomes available.

## VIII

¶102 We apply next the relevant permissible uses, limitations and cautions to an examination of the record in this case.  Loomis argues that he is entitled to a resentencing hearing because the circuit considered the COMPAS risk assessment in imposing his sentence.  According to Loomis, this is a violation of his due process rights because he argues that a COMPAS risk assessment should never be considered at sentencing.

¶103 Notably, Loomis does not argue that the other factors the court considered at sentencing were insufficient to support the sentence he received.  In fact, at oral argument Loomis's counsel acknowledged that he would not be challenging the sentence imposed if it were devoid of any reference to the COMPAS risk assessment.  He argues instead that even if there

42

are other bases for the circuit court's sentence, this does not overcome the error of considering the COMPAS risk assessment.

¶104 As discussed above, if used properly with an awareness of the limitations and cautions, a circuits court's consideration of a COMPAS risk assessment at sentencing does not violate a defendant's right to due process. The circuit court here was aware of the limitations. Two limitations were set forth by the DOC in the PSI containing the COMPAS report. Thus, when Loomis was sentenced, the circuit court was aware that "risk scores are not intended to determine the severity of the sentence or whether an offender is incarcerated." The third limitation, that a COMPAS risk assessment may not be determinative in deciding whether a defendant may be supervised safely and effectively in the community is a corollary limitation to those already set forth in the PSI.

¶105 With respect to the cautions this opinion requires, we intend that they be used to inform courts of due process implications. These cautions will enable sentencing courts to better assess the weight to be given to the COMPAS risk scores, circumventing potential due process violations. Here, however, the record reflects that although the circuit court referenced the risk assessment at sentencing, the court essentially gave it little or no weight.

¶106 At the post-conviction motion hearing, the circuit court explained that it used the COMPAS risk assessment to corroborate its findings and that it would have imposed the same

sentence regardless of whether it considered the COMPAS risk scores:

> I think its accurate and safe for this court to say that had there been absolutely no mention of the risk assessment tool in the Presentence Report, had the COMPAS not been attached to the presentence report, that the sentence would have been exactly the same because of the court's evaluation of the sentencing factors that are required under the [] law.

¶107 The circuit court explained that it considered the COMPAS risk assessment as "an observation" to reinforce its assessment of the other factors it considered:

> In other words, the factors that were cited by the court suggested low probability of success on supervision and serious crime. And that was reinforced by the fact that the risk assessment tool shows high risk in all areas . . .

> The court identified factors that were apparent to Mr. Loomis's history and the nature of the offenses. And then went to the COMPAS as an instrument, basically, that supported that evaluation.

¶108 This is consistent with the sentencing transcript, in which the circuit court explained that it was also considering the seriousness of the crime and Loomis's criminal history and history on supervision in ruling out probation. A review of the sentencing transcript reveals that the circuit court also addressed and discussed the gravity of the offense, the character and rehabilitative needs of the defendant, and the need to protect the public. See Gallion, 270 Wis. 2d 535, ¶13.

¶109 Thus, the record reflects that the sentencing court considered the appropriate factors and was aware of the limitations associated with the use of the COMPAS risk

44

assessment. Ultimately, although the circuit court mentioned the COMPAS risk assessment, it was not determinative in deciding whether Loomis should be incarcerated, the severity of the sentence or whether he could be supervised safely and effectively in the community.

¶110 Additionally, although the circuit court was unaware of the cautions set forth above, those cautions are required in part to ensure that undue weight is not given to the COMPAS risk scores. As the circuit court explained at the post conviction hearing, it would have imposed the exact same sentence without it. Accordingly, we determine that the circuit court's consideration of COMPAS in this case did not violate Loomis's due process rights.

IX

¶111 As a final matter, Loomis argues that the circuit court improperly gave undue weight to read-in charges at sentencing. He asserts that not only did the circuit court appear to misunderstand the difference between dismissed and read-in charges, but it improperly assumed that the factual basis for the read-in charges was true.

¶112 In Frey, 343 Wis. 2d 358, ¶61, this court clarified how the read-in procedure and dismissed charges fit into the plea bargaining process. The circuit court can consider uncharged or unproven offenses regardless of whether the defendant consented to having the charges read in or dismissed outright. Id., ¶47.

45

¶113 Frey explained that it is preferable for the circuit court to "acknowledge and discuss dismissed charges, if they are considered by the court, giving them appropriate weight and describing their relationship to a defendant's character and behavioral pattern or to the incident that serves as the basis for a plea." Id., ¶54. Open discussion of dismissed charges is consistent with the sentencing methodology set forth in Gallion and allows the defendant the opportunity to explain or dispute the charges. Id.

¶114 Additionally, read-in charges are expected to be considered at sentencing "with the understanding that the read-in charges could increase the sentence up to the maximum that the defendant could receive for the conviction in exchange for the promise not to prosecute those additional offenses." Id., ¶68.

¶115 Loomis asserts that the circuit court appeared to misunderstand the difference between dismissed charges and those that are dismissed but read in. At sentencing, the circuit court initially erred in its statement regarding dismissed and read-in charges when it stated that it could not consider the dismissed charges at all, but would consider the read-in charges as true. However, the circuit court took a break from the hearing to review Frey and continued the hearing under the proper framework.

¶116 Although the circuit court may have initially misstated that under Frey there is no distinction between read-in charges and dismissed charges, the circuit court's

46

consideration of the read-in charges was not an erroneous exercise of discretion. It subsequently clarified the proper use.

¶117 During the plea hearing, quoting directly from Frey, the circuit court advised Loomis of the proper legal standard regarding how it would consider the read-in offenses at sentencing. It allowed both sides to debate the merits of the charges and ultimately believed the State's version of events was more credible.

¶118 At the post-conviction motion hearing, the circuit court reviewed the plea hearing transcript and the sentencing transcript and explained how it weighed the facts in addressing the read-in charges:

> The Court had to give weight, greater weight or lesser weight to the facts that's relating [sic] to the shooting. I felt Mr. Loomis's explanation was inconsistent with the facts. The State's version was more consistent with the facts and gave greater weight to the State's version at sentencing.

¶119 Thus, the circuit court weighed the facts, assessed the credibility and the recognized legal standards for read-in offenses. Accordingly, we conclude that the circuit court's consideration of the read-in charges was not an erroneous exercise of discretion.

X

¶120 Ultimately, we conclude that if used properly as set forth herein, a circuit court's consideration of a COMPAS risk assessment at sentencing does not violate a defendant's right to

due process and that the circuit court did not erroneously exercise its discretion here.

¶121 We further conclude that the circuit court's consideration of the read-in charges was not an erroneous exercise of discretion.

¶122 Accordingly, we affirm the order of the circuit court.

*By the Court*.–The order of the circuit court is affirmed.

¶123 PATIENCE DRAKE ROGGENSACK, C.J. *(concurring).* I agree with much of the majority opinion's discussion and I concur in its result; however, I write to clarify that while our holding today permits a sentencing court to <u>consider</u> COMPAS, we do not conclude that a sentencing court may <u>rely</u> on COMPAS for the sentence it imposes. Because at times the majority opinion interchangeably employs <u>consider</u> and <u>rely</u> when discussing a sentencing court's obligations and the COMPAS risk assessment tool, our decision could mistakenly be read as permitting reliance on COMPAS.[1] Therefore, I write to clarify for the reader.[2]

¶124 At sentencing, the circuit court is to consider three primary factors: gravity of the offense, character of the offender and the need to protect the public. <u>State v. Alexander</u>, 2015 WI 6, ¶22, 360 Wis. 2d 292, 858 N.W.2d 662. A circuit court's proper exercise of sentencing discretion includes an individualized sentence based on the facts of the case and may include explaining how the sentence imposed

---

[1] <u>See, e.g.,</u> majority op., ¶¶8, 31, 48, 82, 85, 98-99.

[2] Contrary to the manner in which the majority opinion sometimes employs "consider" and "rely," they are not interchangeable. "Rely" is defined as "to be dependent" or "to place full confidence." <u>Webster's New Collegiate Dictionary</u> 977 (1974). Therefore, to permit circuit courts to rely on COMPAS is to permit circuit courts to depend on COMPAS in imposing sentence. On the other hand, "consider" is defined as "to observe" or to "contemplate" or to "weigh." <u>Id.</u> at 241-42. Therefore, to permit circuit courts to consider COMPAS is to permit circuit courts to observe a COMPAS risk assessment and weigh it along with other relevant factors in imposing sentence.

furthers the circuit court's objectives. Id. (citing State v. Harris (Landray M.), 2010 WI 79, ¶29, 326 Wis. 2d 685, 786 N.W.2d 409).[3]

¶125 A sentencing court must articulate the factors that it considered at sentencing and how they affected the sentence it imposed. State v. Harris (Denia), 119 Wis. 2d 612, 623, 350 N.W.2d 633 (1984). It is through this articulation that we determine whether the circuit court properly exercised its sentencing discretion. Id. Defendants have a due process right not to be sentenced in reliance on improper factors such as on race or gender. Harris (Landray M.), 326 Wis. 2d 685, ¶33.

¶126 The circuit court's consideration of various sentencing factors is afforded a "strong presumption of reasonability because the circuit court is best suited to consider the relevant factors and demeanor of the convicted defendant." State v. Gallion, 2004 WI 42, ¶18, 270 Wis. 2d 535, 678 N.W.2d 197 (internal quotation marks omitted). Therefore, a circuit court's sentencing decision is upheld unless it exhibits an erroneous exercise of discretion by sentencing based on irrelevant or improper factors. Id., ¶17; Harris (Landray M.), 326 Wis. 2d 685, ¶30. In addition, any reference to a potentially improper sentencing factor is reviewed in the

_____

[3] See State v. Gallion, 2004 WI 42, ¶43 n.11, 270 Wis. 2d 535, 678 N.W.2d 197 which identifies numerous, supplemental sentencing factors that circuit courts may consider under the appropriate circumstances of each case.

context of the circuit court's sentencing record as a whole. Harris (Landray M.), 326 Wis. 2d 685, ¶45.

¶127 As the majority opinion aptly explains, the circuit court here appropriately considered numerous sentencing factors when imposing sentence and merely mentioned the defendant's COMPAS risk assessment in passing.[4] The circuit court detailed the three primary sentencing factors and explained how the facts of the case warranted the sentence imposed.[5] Therefore, I agree with the majority opinion that circuit courts may consider a COMPAS risk assessment along with a multitude of other relevant factors at sentencing, as was done in this case.[6]

¶128 However, one of my concerns is that the certified question frames the issue presented as "whether the right to due process prohibits circuit courts from relying on COMPAS assessments when imposing sentence."[7] The majority opinion concludes that "if used properly with an awareness of the limitations and cautions, a circuit court's consideration of a COMPAS risk assessment at sentencing does not violate a defendant's right to due process."[8] I agree that "consideration" of COMPAS does not contravene defendant's right to due process.

---

[4] Majority op., ¶¶85, 107-09.

[5] Id., ¶¶85, 104-10.

[6] Id., ¶¶105, 109-10.

[7] State v. Loomis, No. 2015AP157-CR, 2015 WL 5446731, 1 (Wis. Ct. App. Sept. 17, 2015) (emphasis added).

[8] Majority op., ¶104 (emphasis added).

3

¶129 However, the question presented on certification is whether due process prohibits circuit courts from relying on COMPAS, and then the majority opinion's answering that question in the negative, even though it employs the word "consideration," may cause the majority opinion to be read as permitting circuit court reliance on COMPAS. Stated otherwise, rather than merely considering COMPAS as one of many factors relevant to sentencing, the majority opinion, due to its interchangeable use of "rely" and "consider," together with the certified question, may be read to permit a circuit court to rely on COMPAS to determine the appropriate sentence. Reliance would violate due process protections. Accordingly, I write to clarify our holding in the majority opinion: consideration of COMPAS is permissible; reliance on COMPAS for the sentence imposed is not permissible.

¶130 SHIRLEY S. ABRAHAMSON, J. *(concurring).* I join the majority opinion. It describes the salient issues raised by considering COMPAS at sentencing, and informs the bench and the bar of the limitations and cautions that should be observed in considering COMPAS in sentencing. It underscores that we are addressing the use of a research-based tool and that it is incumbent upon actors in the criminal justice system to recognize that additional research data may become available in the future and different, better tools may be developed.

¶131 I write separately to make two points:

¶132 First, I conclude that in considering COMPAS (or other risk assessment tools) in sentencing, a circuit court must set forth on the record a meaningful process of reasoning addressing the relevance, strengths, and weaknesses of the risk assessment tool.

¶133 Second, this court's lack of understanding of COMPAS was a significant problem in the instant case. At oral argument, the court repeatedly questioned both the State's and defendant's counsel about how COMPAS works. Few answers were available.

¶134 Northpointe, the company that created COMPAS, sought to file an amicus brief in the instant case to discuss the history, accuracy, and efficacy of COMPAS, as well as the use of risk assessment tools like COMPAS throughout the criminal justice system.

¶135 The court denied (over my dissent and without comment) Northpointe's motion to file an amicus brief. The denial was a

mistake. The court needed all the help it could get. The majority opinion considers publications by Northpointe. Why could it not consider an amicus brief by Northpointe?

¶136 For these reasons, I write separately.

I

¶137 I would hold that a circuit court, in considering COMPAS (or another risk assessment tool) in sentencing, must evaluate on the record the strengths, weaknesses, and relevance to the individualized sentence being rendered of the evidence-based tool (or, more precisely, the research-based or data-based tool).

¶138 Such an explanation is needed, I think, because the use of risk assessment tools like COMPAS has garnered mixed reviews in the scholarly literature and in popular commentary and analysis.

¶139 For example, although then-Attorney General Eric Holder endorsed the use of risk assessment tools in preparing and planning for the reentry of offenders into society, he cautioned against using risk assessment tools in sentencing. Attorney General Holder warned that using "static factors and immutable characteristics, like the defendant's education level, socioeconomic background or neighborhood" in sentencing could have unintended consequences, including undermining our goal of "individualized justice, with charges, convictions, and

sentences befitting the conduct of each defendant and the particular crime he or she commits."[1]

¶140 Attorney General Holder's concerns have been echoed in other studies.[2] Additionally, studies differ regarding the accuracy of COMPAS's recidivism (and especially violent

_____

[1] See Ryan J. Reilly, Eric Holder Warns of Risks in 'Moneyballing' Criminal Justice, Huffington Post (11:28 AM Aug. 1, 2014), http://www.huffingtonpost.com/2014/08/01/eric-holder-moneyball-criminal-justice_n_5641420.html.

Wisconsin law also recognizes the need for individualized sentences. See State v. Gallion, 2004 WI 42, ¶48, 270 Wis. 2d 535, 678 N.W.2d 197 (recognizing that individualized sentencing "has long been a cornerstone to Wisconsin's criminal justice jurisprudence.").

University of Wisconsin Law Professor Cecelia Klingele summarized the challenges inherent in using these tools in The Promises and Perils of Evidence-Based Corrections, 91 Notre Dame L. Rev. 537, 576-78 (2015).

[2] See Jeff Larson et al., How We Analyzed the COMPAS Recidivism Algorithm, Pro Publica (May 23, 2016), https://www.propublica.org/article/how-we-analyzed-the-compas-recidivism-algorithm; see also Julia Angwin et al., Machine Bias, Pro Publica (May 23, 2016), https://www.propublica.org/article/machine-bias-risk-assessments-in-criminal-sentencing (reviewing the findings of Pro Publica's study and discussing numerous anecdotal examples of individuals whose risks of recidivism were incorrectly assessed).

recidivism) scores.[3] The circuit court has to show its awareness of and consideration of these issues.

¶141 I recognize that the demands on circuit courts are many and their resources relatively few, but making a record, including a record explaining consideration of the evidence-based tools and the limitations and strengths thereof, is part of the long-standing, basic requirement that a circuit court explain its exercise of discretion at sentencing.

¶142 Such a process increases the likelihood that circuit courts will remain abreast of new developments in evidence-based decision making and cognizant of the qualities of the tools

---

[3] See, e.g., Sheldon X. Zhang et al, An Analysis of Prisoner Reentry and Parole Risk Using COMPAS and Traditional Criminal History Measures, 60 Crime & Delinquency 167, 187 (2014) (finding that a model assessing just four static variables——gender, age, age of first arrest, and number of prior arrests——performed just as well as COMPAS in predicting prior arrests); Jennifer L. Skeem & Jennifer Eno Louden, Assessment of Evidence on the Quality of Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) 28 (2007), http://www.cdcr.ca.gov/adult_research_branch/Research_Documents/ COMPAS_Skeem_EnoLouden_Dec_2007.pdf (last visited July 1, 2016) (stating that "there is little evidence that the COMPAS predicts recidivism," and "there is no evidence that the COMPAS assesses risk state, or change over time in criminogenic needs."); but see Sharon Lansing, New York State COMPAS-Probation Risk and Need Assessment Study: Examining the Recidivism Scale's Effectiveness and Predictive Accuracy, N.Y. Div. Crim. Justice Servs., Office of Justice Research & Performance, at i (Sept. 2012) (concluding that COMPAS's "Recidivism Scale worked effectively and achieved satisfactory predictive accuracy," namely 71% accuracy); Tim Brennan et al., Evaluating the Predictive Validity of the COMPAS Risk and Needs Assessment System, 36 Crim. Just. & Behavior 21, 30 (2009) (determining, in a study by three individuals for Northpointe, the company that markets COMPAS, that COMPAS's risk models are "satisfactor[il]y predictive . . . .").

4

utilized. Such a process also provides appellate courts with a meaningful record to review and provides the State, the defendant, and the public with a transparent and comprehensible explanation for the sentencing court's decision.

II

¶143 With evidence-based decision making on the rise, amicus briefs evaluating the research and data will, in all likelihood, become more important. As Judge Richard Posner has written, "[m]ost judges are generalists, and increasingly we are confronted by complexities that most of us have difficulty understanding."[4] One way of addressing these complexities is taking a more expansive view toward accepting amicus briefs.

¶144 The court denied Northpointe's motion to file an amicus brief over my dissent. <u>See</u> Attachment A. COMPAS is proprietary, and Northpointe considers COMPAS's algorithms trade secrets. As a result, Northpointe does not disclose how COMPAS determines individual risk scores or it how weighs various factors in arriving at a risk score.

¶145 Northpointe has an obvious financial and proprietary interest in the continued use of COMPAS. The court could have taken Northpointe's interests into account in weighing Northpointe's amicus brief.

¶146 This court's orders accepting and rejecting amicus briefs have generally not explained the court's decision, and the orders have not been consistent. Perhaps Northpointe's

---

[4] Richard A. Posner, <u>Reflections on Judging</u> 55 (2013).

brief was rejected because Northpointe had an interest in the use of its tool.

¶147 In contrast, in another order denying a motion to file an amicus brief (Attachment B), the amicus had no legally cognizable interest in the case.

¶148 Yet in Thompson v. Craney, 199 Wis. 2d 674, 546 N.W.2d 123 (1996), the court accepted an amicus brief filed by then-Assembly Speaker David T. Prosser arguing that the legislative enactment at issue in that case was constitutional.

¶149 In a recent case addressing similar issues to those raised in Thompson, the court permitted an amicus to file a brief and raise issues that the parties did not address. See Coyne v. Walker, No. 2013AP416, unpublished orders dated Sept. 22, 2015 and October 1, 2015.

¶150 Without providing an explanation for the court's acceptance or denial of amicus briefs, we provide no guidance to lawyers and other interested persons wishing to file amicus briefs in future cases. The court should, in my opinion, take a more expansive view toward granting motions to file amicus briefs.

¶151 For the reasons set forth, I concur and write separately.

6

**ATTACHMENT A**



OFFICE OF THE CLERK

# Supreme Court of Wisconsin

110 EAST MAIN STREET, SUITE 215
P.O. BOX 1688
MADISON, WI 53701-1688

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

March 11, 2016

To:

Hon. Scott L. Horne
La Crosse County Circuit Court Judge
333 Vine Street
La Crosse, WI 54601

Christine A. Remington
Assistant Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Pamela Radtke
La Crosse County Clerk of Circuit Court
333 Vine Street, Room 1200
La Crosse, WI 54601

Michael D. Rosenberg
Community Justice, Inc.
214 N. Hamilton Street, Suite 101
Madison, WI 53703

Tim Gruenke
District Attorney
333 Vine Street, Room 1100
La Crosse, WI 54601

John B. Tuffnell
Tuffnell Law S.C.
788 N. Jefferson Street, Suite 900
Milwaukee, WI 53202

You are hereby notified that the Court has entered the following order:

No. 2015AP157-CR      State v. Loomis L.C.#2013CF98

The court having considered the motion of Northpointe Inc. for leave to file a non-party brief amicus curiae;

IT IS ORDERED that the motion is denied.

¶1      SHIRLEY S. ABRAHAMSON, J. *(dissenting)*. The requirements set forth in Wis. Stat. § 809.19(7) governing amicus briefs are relatively few. See Michael S. Heffernan, Appellate Practice and Procedure in Wisconsin, ch. 11, § VIII, at 25-26 (2015). The motion in the instant case meets these requirements.

¶2      The court issues an order denying the motion. I would grant the motion.

1

¶3      Once again, the court offers no explanation of its order to assist this movant or future movants.

¶4      Northpointe, Inc. states that it wishes to file an amicus brief because it developed COMPAS, the sentencing tool at issue in the instant case.  Northpointe argues that it is uniquely positioned to discuss the history, accuracy, and efficacy of COMPAS, as well as the use of actuarial risk needs assessments across the criminal justice continuum, and may bring to the court's attention certain issues and points of law that may assist the court in reaching its decision on the merits.

¶5      I surmise that the court may be denying this motion because, as the developer of COMPAS, Northpointe, Inc. would have an interest in promoting its product and might benefit or be harmed financially by the court's writing on COMPAS in State v. Loomis.  Northpointe does not, however, appear to have a specific interest in the circuit court's decision about the sentence to be imposed on this particular defendant, Eric Loomis.

¶6      In addition to Northpointe's financial interest, it claims the software is proprietary information.

¶7      I would not necessarily deny a motion to file an amicus brief because the movant has a financial or other interest in the subject matter of the case or because of the claim of the software's proprietary nature.  Amici generally have a strong interest in a case or an important stake in an outcome.  Why else would a person or entity take the time and trouble to seek amicus status?

¶8      The propriety of using COMPAS and risk assessment instruments to reach evidence-based decisions is an emerging area of the law.  COMPAS risk assessment instruments present issues that are novel, technical, and complex.  The court's decision in the instant case may affect far more people than the parties.

¶9      The briefs of both parties cite to reference materials relating to COMPAS, risk-needs assessment, and evidence-based sentencing.  Why cannot an amicus brief by Northpointe play the same role as the citations in the briefs to reference books or articles by Northpointe or about Northpointe's COMPAS?  The court knows of Northpointe's financial and proprietary interests and can take these into account in evaluating Northpointe's amicus brief.

¶10     Judges across the country disagree regarding the merits of amicus briefs or the approach a court should take to requests to file amicus briefs.  Compare, e.g., Judge Richard Posner's views expressed in Voices for Choice v. Ill. Bell. Tel. Co., 339 F.3d 542, 545 (7th Cir. 2003) (generally viewed as hostile to amicus briefs), with then-Judge Samuel Alito's views expressed in Neonatology Assocs. P.A. v. C.I.R., 293 F.3d 128, 133 (3d Cir. 2002) (generally viewed as more friendly toward amicus briefs).

¶11    Much has been written about amicus briefs and risk assessments. For discussions of amicus briefs or risk assessment tools, see, e.g., Cecelia Klingele, The Promises and Perils of Evidence Based Corrections, 91 Notre Dame L. Rev. 537 (2015); Lawrence S. Edner & Rubin S. Conrad, Making Strategic Use of Amicus Briefs, For the Defense (Oct. 2015); Mary-Christine Sungaila, Amicus Briefs: How to Write Them, When to Ask for Them, GP Solo (Sept/Oct. 2015); Michael K. Lowman, The Litigating Amicus Curiae: When Does the Party Begin After the Friends Leave?, 41 Am. U. L. Rev. 1243 (1992); Samuel Krislov, The Amicus Curiae Brief: From Friendship to Advocacy, 72 Yale L.J. 694 (1963); Andrew Frey, Amici Curiae: Friends of the Court or Nuisances?, Litig., Fall 2006, at 5; Philip B. Kurland & Dennis J. Hutchinson, With Friends Like These . . . , Am. Bar. Ass'n J., Aug. 1984, at 16; Joseph Fred Benson, The Court Needs Its Friends, Am. Bar. Ass'n J., Aug. 1984, at 16; Neal Nettesheim & Clare Ryan, Friend of the Court Briefs: What the Curiae Wants in an Amicus, Wis. Lawyer, May 2007, at 11; Judith S. Kaye, An Invitation to "Friends", N.Y.L.J., Dec. 28, 1988, at 1.

¶12    My analysis of this court's orders accepting and rejecting amicus briefs over the years is that they generally do not explain the court's decision; they do not guide lawyers and other interested persons in filing amicus briefs in future cases; and they do not provide the benefit of reasoned decisions so that the court can be thoughtful and consistent in its approach to amicus briefs.

¶13    The court should, in my opinion, take a more expansive view to granting motions to file an amicus brief. A court can use all the help it can get. An amicus may have particular expertise and may present a perspective that the parties cannot or will not advocate. I agree with Judge Samuel Alito (now Supreme Court Justice Samuel Alito) in writing that requiring amici to be limited to persons or entities that are impartial or disinterested "is contrary to the fundamental assumption of our adversary system that strong (but fair) advocacy on behalf of opposing views promotes sound decision making." Neonatology Assocs., 293 F.3d at 131.

¶14    The court knows of Northpointe's financial and proprietary interests. If the amicus brief proves useless to the court, the court can easily set it aside.

¶15    In closing, I write to object once again to unilateral directives imposed by one member of the court on a justice's separate writings. For my prior writings objecting to this practice, see my dissent to the December 4, 2015 unpublished order of four justices setting a deadline for motions to intervene in the John Doe trilogy; my concurrence/dissent to the January 12, 2016 unpublished order of four justices granting the motion of three district attorneys to intervene in the John Doe trilogy; my separate writings in the unpublished orders granting review in three cases, State v. Finley, No. 2014AP2488-CR; Wis. Carry v. City of Madison, No. 2015AP146; and Regency West Apts. v. City of Racine, No. 2014AP2947; my concurrence/dissent in In re Disciplinary Proceedings Against Roitburd; 2015 WI 1, ¶¶35-54, ___ Wis. 2d ___, ___ N.W.2d ___; and my concurrence/dissent to the March 8, 2016 order denying judicial notice in Clark v. Am. Cyanamid Co., No. 2014AP775.

Page 4
March 11, 2016
No. 2015AP157-CR          State v. Loomis  L.C.#2013CF98

¶16    As I have often written, I favor deadlines for writings of justices and staff. But deadlines should be imposed by the court and uniformly and consistently applied.

¶17    For the reasons set forth, I dissent and would grant the request to file an amicus brief.

Prosser, J., dissents and would grant the motion.

Diane M. Fremgen
Clerk of Supreme Court

**ATTACHMENT B**

OFFICE OF THE CLERK



# Supreme Court of Wisconsin

110 EAST MAIN STREET, SUITE 215
P.O. BOX 1688
MADISON, WI 53701-1688

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

May 19, 2016

To:

Hon. Richard J. Sankovitz
Milwaukee County Circuit Court Judge
821 W. State St.
Milwaukee, WI 53233

John Barrett
Milwaukee County Clerk of Circuit Court
901 N. 9th St., Rm. G-8
Milwaukee, WI 53233

Timothy A. Bascom
Bascom, Budish & Ceman, S.C.
2600 North Mayfair Rd., #1140
Milwaukee, WI 53226

Donald H. Carlson
Crivello Carlson S.C.
710 N. Plankinton Ave., Ste. 500
Milwaukee, WI 53203

Stephen J. McManus
McManus & Associates LLC
12700 W. Bluemound Rd., Ste. 130
Elm Grove, WI 53122

*Additional Parties listed on Page Three

You are hereby notified that the Court has entered the following order:

No. 2014AP2376        Brenner v. National Casualty Company L.C.#2012CV12446

The court having considered the motion of Charles P. Dykman for leave to file non-party brief amicus curiae;

IT IS ORDERED that the motion is denied.

DAVID T. PROSSER and REBECCA G. BRADLEY, J.J., did not participate.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). The court issues an order denying Charles Dykman's motion to file an amicus brief under Wis. Stat. § 809.19(7). I would grant the motion and would grant the Brenners' request to respond to the amicus brief.

Once again, the court offers no explanation of its order to assist this movant or future movants.

5

Page Two
May 19, 2016
No. 2014AP2376      <u>Brenner v. National Casualty Company</u> L.C.#2012CV12446

The requirements set forth in Wis. Stat. § 809.19(7) governing amicus briefs are relatively few. See Michael S. Heffernan, <u>Appellate Practice and Procedure in Wisconsin</u>, ch. 11, § VIII, at 25-26 (2015). The motion in the instant case meets these requirements.

That Charles Dykman has no legally cognizable interest in the case does not bar him from filing an amicus brief. Indeed sometimes such an interest may be a barrier to filing an amicus brief. <u>See State v. Loomis</u>, No. 2015AP157-CR, unpublished order dated Mar. 11, 2016 (Abrahamson, J., dissenting).

I recognize that the amicus brief would raise issues that the parties did not address. We recently allowed such an amicus brief in <u>Coyne v. Walker</u>, No. 2013AP416. <u>See</u> unpublished order dated Sept. 22, 2015; <u>see also</u> unpublished order dated Oct. 1, 2015.

Judges across the country disagree regarding the merits of amicus briefs or the approach a court should take to requests to file amicus briefs. Compare, e.g., Judge Richard Posner's views expressed in <u>Voices for Choice v. Ill. Bell. Tel. Co.</u>, 339 F.3d 542, 545 (7th Cir. 2003) (generally viewed as hostile to amicus briefs), with then-Judge Samuel Alito's views expressed in <u>Neonatology Assocs. P.A. v. C.I.R.</u>, 293 F.3d 128, 133 (3d Cir. 2002) (generally viewed as more friendly toward amicus briefs).

My analysis of this court's orders accepting and rejecting amicus briefs over the years is that the orders generally do not explain the court's decision; they do not guide lawyers and other interested persons in filing amicus briefs in future cases; and they do not provide the benefit of reasoned decisions so that the court can be thoughtful and consistent in its approach to amicus briefs.

The court should, in my opinion, take a more expansive view to granting motions to file an amicus brief. A court can use all the help it can get. An amicus may have particular expertise and may present a perspective that the parties cannot or will not advocate.

Much has been written about amicus briefs. For discussions of amicus briefs, <u>see, e.g.</u>, Lawrence S. Edner & Rubin S. Conrad, <u>Making Strategic Use of Amicus Briefs</u>, For the Defense (Oct. 2015); Mary-Christine Sungaila, <u>Amicus Briefs: How to Write Them, When to Ask for Them</u>, GP Solo (Sept/Oct. 2015); Michael K. Lowman, <u>The Litigating Amicus Curiae: When Does the Party Begin After the Friends Leave?</u>, 41 Am. U. L. Rev. 1243 (1992); Samuel Krislov, <u>The Amicus Curiae Brief: From Friendship to Advocacy</u>, 72 Yale L.J. 694 (1963); Andrew Frey, <u>Amici Curiae: Friends of the Court or Nuisances?</u>, Litig., Fall 2006, at 5; Philip B. Kurland & Dennis J. Hutchinson, <u>With Friends Like These . . .</u>, Am. Bar. Ass'n J., Aug. 1984, at 16; Joseph Fred Benson, <u>The Court Needs Its Friends</u>, Am. Bar. Ass'n J., Aug. 1984, at 16; Neal Nettesheim & Clare Ryan, <u>Friend of the Court Briefs: What the Curiae Wants in an Amicus</u>, Wis. Lawyer, May 2007, at 11; Judith S. Kaye, <u>An Invitation to "Friends"</u>, N.Y.L.J., Dec. 28, 1988, at 1.

6

Page Three
May 19, 2016
No. 2014AP2376        <u>Brenner v. National Casualty Company</u> L.C.#2012CV12446


For the reasons set forth, I dissent and would grant the request to file an amicus brief.

<hr>

Diane M. Fremgen
Clerk of Supreme Court


<u>*Additional Parties:</u>

Bryan J. Paradise
Hennessy & Roach PC
414 E. Walnut St., Ste. 200
Green Bay, WI 54301-5020

Pamela M. Schmidt
Scopelitis Garvin Light Hanson & Feary
330 E. Kilbourn Ave., Ste. 827
Milwaukee, WI 53202

Charles P. Dykman
4611 Tonyawatha Trail
Monona, WI 53716

Timothy S. Trecek
Habush, Habush & Rottier, S.C.
777 E. Wisconsin Ave., #2300
Milwaukee, WI 53202-5302

Susan R. Tyndall
Habush Habush & Rottier, S.C.
N14 W23755 Stone Ridge Dr., Ste. 100
Waukesha, WI 53188-1147